IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANA S. INGRAM,

      Plaintiff,                                CIV S-08-2829 GGH

    vs.

MICHAEL J. ASTRUE,                      ORDER
Commissioner of Social Security,

      Defendant.

_____/

*Introduction and Summary*

        Plaintiff filed for Supplemental Security Benefits (SSI, Title XVI) on December 6, 2005. This was her *seventh* application, all of the preceding applications having been denied. Therefore, a presumption of non-disability applied in this case, and plaintiff must show changed circumstances indicating the presence of a disability. See Chavez v. Bowen, 844 F.2d 691 (9th Cir. 1998). The Administrative Law Judge (ALJ) denied plaintiff's claim on June 23, 2008; review was denied by the Appeals Council on September 18, 2008. A timely complaint was filed in this action. Both sides have moved for summary judgment.

        For the reasons set forth below, plaintiff's motion is denied; the Commissioner's cross-motion is granted.

*ALJ Decision*

Review having been denied by the Appeals Council, the ALJ's decision was the final decision of the Commissioner. The ALJ's formal findings were as follows:

1. The claimant filed her current application for supplemental security income benefits on December 6, 2005.

2. The claimant has not engaged in any substantial gainful activity since January 1, 2001, the alleged onset date of disability.

3. The medical evidence establishes that the claimant suffers from hand injuries, memory problems and a substance addiction disorder in remission that are "non-severe." The medical evidence establishes that the claimant suffers from a seizure disorder, asthma, depression that are "severe."

4. The medically established disorders are not attended by clinical and laboratory findings that meet or equal the criteria of any section of the Listing of Impairments at 20 C.F.R., Part 404, Subpart P, Appendix 1 for the requisite period.

5. There are medical disorders to account for the type of subjective complaints, but the alleged intensity, persistence and functionally limiting effects of the symptoms are not found fully credible for the reasons discussed in the body of this decision.

6. The claimant retains the residual functional capacity to perform light of sedentary work involving simple, repetitive tasks. The claimant is further precluded from work at heights, around moving machinery or driving and in environments of dusts, gases, fumes, odors or poor ventilation.

7. The claimant does not retain the residual functional capacity to perform her past relevant work.

8. The claimant is a younger individual at age 41 years.

9. The claimant has a high school education.

10. There is no issue of transferable skills.

11. There are jobs existing in significant numbers in the

|   |   | national economy that the claimant can perform considering her vocational profile and residual functional capacity, based upon the testimony of a qualified vocational expert and in light of the record as a whole. |
|---|---|---|
|   | 12. | The claimant is not under a disability, as defined in the Social Security Act, beginning at any time on or before the date of this decision. |

*Issues*

Plaintiff has raised the following issues:

1. By failing to include prior medical evidence, the ALJ failed to properly develop the record;

2. Improper rejection of treating physician's opinions;

3. Failure to properly credit plaintiff's testimony as to the extent of her limitations;

4. Failure to properly assess the residual functional capacity (RFC) and failure to credit the vocational expert's testimony with respect to a specific hypothetical;

5. The jobs available within plaintiff's RFC identified by the vocational expert were not consistent with the Dictionary of Occupational Titles.

The court will review these issues, but will start out with a discussion of administrative res judicata.

*Discussion*

A. Proper Standard of Review Under Chavez

Plaintiff does not dispute that Chavez, i.e., administrative res judicata, applies to this case. A good explication of res judicata principles in Social Security cases appears in the case of Cha Yang v. Astrue, 2010 WL 2768122 (E.D. Cal. 2010):

> The principles of res judicata apply to administrative proceedings. Lyle v. Sec. Health & Human Serv., 700 F.2d 566, 568, n. 2 (9th Cir.1983). A previous finding that a claimant is not disabled creates a presumption of continuing nondisability. Miller v. Heckler, 770 F.2d 845, 848 (9th Cir.1985). An ALJ's finding of nondisability creates "a presumption that [the claimant] continued to be able to work after that date." Id. To overcome this presumption, the claimant must prove "changed circumstances" indicating a greater disability. Chavez v. Bowen, 844 F.3d 691, 693

(9th Cir.1988); Acquiescence Ruling ("Ruling") 97-4(9). For example, a change in age status after the first determination is a changed circumstance sufficient to rebut the presumption of continuing nondisability. Chavez, 844 F.3d at 693. Changed circumstances also include an increase in the severity of the claimant's impairment, the alleged existence of a new impairment, or a change in the criteria for determining disability. Ruling 97-4(9).

However, even where the claimant is able to overcome the presumption of disability, certain prior findings are entitled to some res judicata consideration. Prior determinations of RFC, education and work experience are entitled to res judicata absent new and material evidence on the issue. Chavez, 844 F.2d at 694. "Adjudicators must adopt such a finding from the final decision on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding." Ruling 97-4(9).

In this case, the ALJ found that the time in which to assess plaintiff's past employment for purposes of this case had expired, and hence that was a "changed circumstance." However, the ALJ found the presumption of non-disability to be insufficiently rebutted. Previous factual findings are therefore binding on the undersigned unless the present evidence indicates a game changer, i.e., an overall "greater disability" or significant change to the basis for certain findings.

B. Development of the Record

Plaintiff argues, rather technically, that the ALJ did not fully develop the record because evidence he relied on from the past proceedings were not made officially part of the record. The undersigned is puzzled by this argument. Obviously, the ALJ had the previous records and did rely on medical records from past proceedings because he expressly referenced them. Tr. 11 *passim*. Those records did not lose their "record" status, simply because they were not officially made part of this ALJ's decision. As is normally the case, judicial notice may be taken of previous filings in administrative and court filings. See Dunn . Castro, __F.3d__, 2010 WL 3547637 *8 (fn.6). Moreover, the ALJ expressly incorporated the most recent previous

administrative decision whose findings are entitled to limited res judicata respect. Tr. 11. Not having contested <u>Chavez</u>'s applicability to this case, plaintiff would not be entitled to re-interpret those records. In any event, the Commissioner rectified any such technical error by making those prior records part of this proceeding's records. <u>See</u> Docket Numbers 15, 16, 27. The undersigned has the previous medical records referenced by the ALJ.[1]

The first claim is rejected.

C. <u>Rejection (Or Less Consideration ) of Plaintiff's Treating Physcian – Dr. Rafanov</u>

This is a case involving a serious ailment. No doubt exists concerning plaintiff's longstanding seizure disorder; the problem is assessing its frequency and ability to be controlled. The 2004 decision essentially found that plaintiff's recounting of the number of seizures was not credible, and that plaintiff's seizures, although reoccurring, were sufficiently controlled by medication. The record demonstrates that plaintiff was most likely to suffer a recurrence if she was under atypical stress or had stopped her medication for whatever reason. Since the time of the 2004 decision, plaintiff essentially had two treating physicians pertinent to her seizure disorder, Dr. Varady and Dr. Rafanov.

A condition which can be controlled or corrected by medication is not disabling. See <u>Montijo v. Secretary of HHS</u>, 729 F.2d 599, 600 (9th Cir.1984). Again, the debate here is whether the treating physician's opinion concerning the "controlability" was improperly rejected. The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201 (9th Cir. 2001); <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995).[2] Ordinarily, more weight is given

---

[1] The Commissioner discusses the accidental removal of part of one physician's record – Dr. Ritu Mukerji-Metzger, Tr. 213-215. However, plaintiff does not assert that she does not have this evaluation. Plaintiff has had the opportunity to correct the record, but apparently has chosen not to do so. She may not be heard now to quibble with an accidental record transmission error. Finally, for the reasons set forth by the Commissioner, any such error was harmless.

[2] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed

to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons. Lester , 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.

Dr.Varady diagnosed intractable seizure disorder (difficult to control) in 2006 and 2007. Tr. 15. Dr. Rafanov started to treat plaintiff in May of 2007. The key opinion given by

---

psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

[3] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

Dr. Rafanov concerns his belief that plaintiff's condition would cause her to miss work approximately four times per month.  The ALJ's analysis regarding the treating physician is set forth at length:

> I find no appreciable change in the frequency or severity of the seizure disorder as noted in the July 26, 2004 hearing decision. There are extended periods when the claimant did not seek medical attention for uncontrolled seizures.  Dr. Mitchell also noted good control of the seizures with medication.  Dr. Varady's progress notes show continued monitoring of the seizure disorder with good control except for intermittent seizure activity when she was without her medication or when her medications were being adjusted.  There are also documented episodes of breakthrough seizures but these episodes are not frequent and continuously uncontrolled with medication.  With only intermittent breakthrough seizures and otherwise extended periods when the seizures are controlled, I find that the claimant does have a severe seizure disorder but is able to perform light or sedentary functions with appropriate seizure precautions.  The seizures and, as evaluated below, the claimant's asthma disorder, might be exacerbated on lifting and carrying more than light or sedentary weights, and there are precautionary preclusions against work at heights and around dangerous, moving machinery or driving.
>
> Dr. Rafanov, the claimant's treating neurologist since May 2007, reported on July 9, 2007 that the claimant had experienced seizures on June 23, 2007, July 6, 2007 and August 7, 2007.  In Dr. Rafanov's opinion, the claimant suffered grand mal epilepsy with loss of consciousness occurring twice monthly and with postictal confusion, exhaustion, and muscle strain that lasted about three days.  Dr. Rafanov noted that the claimant was compliant with her medical regiment that included Keppra, Lamictal, Depakote and Dilantin but with incomplete control.  Nausea was also noted due to the seizures.  In Dr. Rafanov's opinion, the claimant was precluded from work at heights, around machinery, involving driving or using public transportation.  Dr. Rafanov also described problems of social isolation and poor self esteem but believed the claimant was capable of low-stress work.  Dr. Rafanov further estimated that the claimant would be absent from work about four times per month (Exhibit 12F).
>
> I have considered but given less weight to this opinion, in light of the record as a whole.  Dr. Rafanov's assessment is based on only a few months of treatment, and the seizures, as noted by the claimant in her report to Dr. Varady, appear to have occurred because her medications were being adjusted.  Dr. Rafanov's progress notes from May 2007 through October 2007 include a reported complaint by the claimant on July 9, 2007 of a nocturnal grand mal seizure, September 17, 2007 complaint of more than one nocturnal seizure

in two months and nocturnal seizure in October 2007 due to sleep deprivation. Examinations were unremarkable. The claimant also underwent an MRI of the brain that failed to disclose any significantly abnormal medical findings. By October 2007, Dr. Rafanov noted that examination showed the claimant was stable. At that time, no changes were made to her medical regiment (Exhigbit 14F). The progress reports including complaints of nocturnal seizure activity but, by October 2007, the claimant was reportedly stable and she was advised to continue her medical regiment. This is inconsistent with an expectation that the claimant, even with a long history of seizures, would be absent from work four times per month. The MRI of the brain also failed to show abnormal medical signs consistent with active and uncontrolled seizures. Dr. Mitchell and Dr. Varady's progress notes do not support Dr. Rafanov's opinion. Nor is there evidence of significant change for the worse to explain Dr. Rafanov's opinion. Thus, I have considered but give less weight to Dr. Rafanov's opinion (Social Security Ruling 96-2p).

Dr. Rafanov's opinion was not contradicted by another physician; therefore, the ALJ had to be clear and convincing in his rejection of the opinion. The reasons given are certainly clear and no further analysis will be made on this point.

The undersigned also finds them convincing, *looking at the medical evidence alone*, although plaintiff's argument warranted serious consideration. The key issue here involved the ALJ's assessment that Dr. Rafanov did not have enough treatment experience with plaintiff to assess that for twelve months or longer, plaintiff would consistently miss nearly a week's worth of work per month, i.e., have two or more seizures per month. Taking this lack of treatment experience along with the fact that plaintiff's seizure occurrence in the summer of 2007 did appear to revolve around changes in medication, followed by relative stability, the undersigned finds this rationale convincing. The previous record also is consistent with the only sporadic flare-up in seizure activity, brought about mostly by momentary lack of medication or assault/trauma.[4] The ALJ is correct in his assessment that nothing in Dr. Rafanov's medical

---

[4] The undersigned does not place any weight on the ALJ's statement that the MRI apparently showed little or no brain damage which would account for the seizures. The MRI is mostly probative concerning a possible cause for the seizures, or ruling out certain causes, not whether the undisputed fact of seizure occurrence would be more or less frequent. At the very least, the ALJ is

records, outside of medication changes, indicted a reason why plaintiff's seizures would depart from their previous history of relatively infrequent occurrence. Moreover, even Dr. Rafanov's own records over the entire span of treatment did not indicate the frequency of seizures of two per month as he reported on the RFC questionnaire (Tr. 275).

Therefore, the undersigned initially finds that the ALJ did not improperly reject Dr. Rafanov's opinion; however, this finding is subject to further scrutiny after assessing plaintiff's credibility below.

D. Plaintiff's Credibility Regarding the Frequency of Her Seizure and Mental Limitations

The ALJ rejected, in part, plaintiff's testimony that she suffered frequent seizures and had mental impairments which significantly affected her ability to do work. As set forth by plaintiff:

> With respect to seizures, Ms. Ingram testified that her seizure disorder was the primary reason she could not work. Tr. 29-30. She reported that she was currently having 3-4 seizures per month. She testified that in the past they were more frequent but less severe. Tr. 32-33. She also reported that after a seizure she had to sleep for three to four days. Tr. 141.

Summary Judgment Brief at 16.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Vasquez v. Astrue, 572

---

in no more position than the undersigned to interpret the meaning of the MRI, and there is no medical opinion supporting either lay opinion.

F.3d 586, 591 (9th Cir. July 8, 2009); Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Bunnell at 345-46. If the record contains objective medical evidence of an impairment reasonably expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See Vasquez, 572 F.3d at 591. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[5] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Plaintiff is required to show only that her impairment "could reasonably have caused some degree of the symptom." Vasquez, 572 F.3d at 591, *quoting* Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007), Smolen, 80 F.3d at 1282. Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be specific, clear and convincing. Vasquez, 572 F.3d at 591.

   In this case, the ALJ found plaintiff partially credible, exaggerating the frequency of her seizures and her symptoms. In the part applicable to seizures, he stated:

\\\\\

---

[5] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

> She complained of postictal[6] fatigue, injuries sustained because of the seizures.  There are medical disorders to account for the type of subjective complaints, but, based upon the weight of the evidence, I find the severity of the symptoms alleged is not entirely credible.  The medical evidence documents abnormal clinical signs but the seizure episodes are not reported to be of the frequency claimed.  It appears from the medical evidence that there has been good control of the seizures with break-through episodes that do not occur with such frequency as to preclude work activity.  Although Dr. Varady noted postictal fatigue and somnolence, the episodes of seizures are not so frequent as to result in the postictal residuals at the level claimed.  Similarly, the injuries sustained due to the convulsions are not documented to occur with such frequency as to support the claimant's allegation....
>
> ***
>
> The claimant reported minimal daily activities.  She indicated that she receives assistance from her father and a friend to complete daily activities.  The claimant lives alone, completes household chores, shopping, cooking and laundry, albeit with assistance.  At the hearing , she testified that she walks her dog, visits her sister for lunch and works on her house.  When considering the evidence as a whole, I am not persuaded that the alleged intensity, persistence and functionally limiting effects of the subjective complaints are fully credible.

Tr. 17-18.

The undersigned has some difficulty with this reasoning.  First, no explanation is given why the frequency of seizures would affect the symptom intensity post-seizure.  Without this explanation, the conclusion regarding "apples" (degree of symptoms) would initially seem to have little to do with the facts about "oranges" (frequency of seizures).  The post-2004 medical evidence supports plaintiff's testimony insofar that the fatigue and confusion last for about two days.  See Tr. 276, referencing the time parameters for postictal symptoms.  See also Varady facts above.  Finally, the accepted report of "minimal daily activities" is somewhat inconsistent with the later found general conclusion that the evidence as a whole did not support plaintiff's allegations.

---

[6] This is the period, usually measured in no more than hours, and often quite less, in which the brain is recovering from the seizure. During such a period, sometimes described as an improving state of consciousness or awareness, persons may suffer from short term memory loss, confusion, weakness, fatigue and more.  www.epilepsy.com/101/ep101_symptom.  However, some sources report "[F]ollowing a seizure it is common to experience feelings of exhaustion, both mental and physical, that can last for a day or two." *Postictal State*, www.wikipedia.org.wiki/Postictal_state.

In the final analysis, any harm in failing to separate the degree of symptoms alleged from their frequency is harmless. The found frequency of seizures is important to the claim that plaintiff would be precluded from work because of excessive absenteeism. Crediting plaintiff's testimony in part about the severity of her post-seizure symptoms, most importantly her days long recovery from each seizure, the record does not show that plaintiff suffers enough seizures to constitute four or more days off per month because of seizure recovery. At best, the record does not even show an average in the pertinent period of even one seizure per month. And, plaintiff did not testify that she would fail to report actual seizures to her physician. Finally, in the previous administrative appeal, plaintiff conceded that she no longer tracked her seizures. Tr. 56. In light of plaintiff's emphasized memory problems (and she does have some although the degree is subject to dispute), plaintiff proffers no reason why her memory of multiple seizures per month, up to four, should be accepted at face value.[7] There existed clear and convincing evidence that plaintiff's seizure problem would not cause excessive absenteeism.

Plaintiff references no testimony regarding her impaired memory or lack of cognitive skills which was disregarded, and a review of the testimony demonstrates that, in fact, no evidence was elicited on that subject. Plaintiff references no other statements of herself in the record where she describes the effect of any mental impairments.[8] Plaintiff's discussion concerns the ALJ's partial rejection of the argument based on the medical evidence that plaintiff's mental impairments affect her RFC, but this is a substantial evidence or rejection of medical opinion argument applicable to the next issue, not one concerning rejection of plaintiff's credibility. In all fairness, there was nothing substantial to accept or reject about a memory problem, at least

---

[7] No medical records in the current, relevant time period or in the past periods would support plaintiff's testimony of 3-4 seizures a month.

[8] The closest thing to specification of the memory problem appeared in plaintiff's written submission with her claim, Tr. 136. Plaintiff said that when she walked into a room, she would forget why she was there. This ability to be distracted is nothing out of the ordinary experience for all human beings and does not denote a serious memory problem.

from plaintiff's non-description of it.

The court finds plaintiff's attack on her credibility assessment to be non-actionable.

E. Residual Functional Capacity and the Opinion of the Medical & Psychological Experts

The ALJ assessed plaintiff's residual functional capacity as light or sedentary work with the caveat that she be limited to "work involving simple, repetitive tasks." The hypothetical to the vocational expert reflected this limitation. Plaintiff believes even this fairly restrictive limitation to be in excess of the credible evidence involving plaintiff's mental capacities, i.e., plaintiff can perform little, if any, work.

Plaintiff first attacks the RFC finding by arguing that Dr. Rafanov's opinion that plaintiff's seizures would cause her to lose four work days per month was not included within the RFC assessment and resultant hypothetical to the vocational expert. The undersigned has already determined that the rejection of "four days per month" was not erroneous.

The second attack revolves around plaintiff's cognitive skills. April Young was a psychologist who examined plaintiff for the purpose of a disability assessment. Tr. 206-211. In plaintiff's history, she recounted that plaintiff had completed 11 years of school, had acquired her GED, and had received Bs and Cs for grades while in school. In testing, despite her ability to perform satisfactorily in school, plaintiff scored a combined IQ of 68 – borderline mildly mentally retarded. See DSM IV Mental Retardation. A person with this score would typically perform at the sixth grade level at age 18. Id. at § 317. In conversation, plaintiff's memory "for immediate, recent and remote events appeared to be grossly intact." However, plaintiff scored in the "extremely low range" in memory tests. Combining all observations, Dr. Young opined:

> Ms. Ingram's ability to relate to others, including coworkers, supervisory personnel, and the general public in an appropriate manner is essentially unimpaired.
>
> Ms. Ingram's ability to understand and follow instructions is unimpaired. Her ability to maintain the appropriate level of concentration, pace and persistence necessary to perform a one or

13

> two-step simple repetitive task is mildly impaired. However, her performance would be affected by her seizures and memory. Her ability to perform detailed, multi-step and complex tasks is impaired based upon her cognitive functioning.

Tr. 210.

The ALJ in this case did not reject any mental limitation. Rather, plaintiff was found to be significantly limited to simple, repetitive tasks. This limitation is very consistent with the limitations given by Dr. Young. Moreover, this conclusion was not at all different from that which would be entitled to res judicata. "Dr. McCray stated that claimant was able to maintain attention and concentration for simple one and two step tasks and was able to relate to others appropriately." Tr. 54 (2004 decision). Without explanation as to why plaintiff's mental condition would have worsened after 2004, plaintiff seeks to take bits and pieces of evidence to demonstrate that plaintiff's mental condition was worse than the expert stated it to be. The undersigned cannot find that this is so.[9]

Thus, the phrasing of the hypothetical was consistent with the evidence and the res judicata constraints on this court.

F. The DOT and the Hypothetical

The Dictionary of Occupational Titles contains descriptions of the physical and mental attributes required for the performance of a myriad of different, specific jobs. Plaintiff asserts that the vocational expert's listing of two DOT jobs that plaintiff could perform under the hypothetical was inconsistent with the RFC hypothetical with respect to mental limitations. Plaintiff is correct for one job, but incorrect for another, and therefore this argument fails.

Plaintiff correctly identifies the mail clerk job as requiring a reasoning level of "3"

---

[9] Plaintiff relies on the State Agency (non-examining) physician's opinion that plaintiff was "moderately" impaired when it came to concentration persistence or pace. Tr. 232. Indeed, this opinion is inconsistent with the *same doctor's* opinion just a few pages later that plaintiff was "not significantly limited" when it came to maintaining attention and concentration for extended periods, Tr. 235, or in the area of sustained concentration and persistence. Tr. 236. Even accepting the first opinion as the one which should be considered, the non-examining physician's deviation from the opinion of the examining physicians, both old and new, is not an opinion that the ALJ was bound to accept. It also does not find support in the record.

and the bench small parts assembly as a "2." A level "1", "2" and "3" denotes respectively:

> Apply common sense understanding to carry out simple one or two step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
> ***
> Apply common sense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.
> ***
> Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

DICOT, App. C.

It is tempting to just substitute the language in the hypothetical with the precise language in the DOT, but fashioning a decision on simplicity alone here would turn out to be wrong. Rather than adhere to a strict construction of what this limitation equates to in terms of reasoning level, this court prefers to follow the well developed reasoning of the Central District in Meissl v. Barnhart, 403 F. Supp.2d 981 (C.D. Cal. 2005). There, the plaintiff was found to be limited to "simple tasks performed at a routine or repetitive pace." Id. at 982. The court explained that although the Social Security Regulations contained only two categories of abilities in regard to understanding and remembering instructions, either "short and simple" and "detailed" or "complex," the DOT had many more gradations for measuring this ability, and there were six gradations altogether. Id. at 984. For example, level 2 requires application of "commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." DICOT, App. C. The court continued:

> To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Meissl, 403 F. Supp.2d at 984.

Furthermore, the use of the term "uninvolved" along with the term "detailed" in the DOT qualifies it and refutes any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term. Id. The court found that the plaintiff's RFC must be compared with the DOT's reasoning scale. A reasoning level of one requires slightly less than simple tasks that are in some sense repetitive. For example, they include the job of counting cows as they come off a truck. A reasoning level of two would encompass an RFC of being able to do "simple and repetitive work tasks." Id. Taking Meissl to the next level would lead to the conclusion that a reasoning level of three would therefore include the ability to do more than simple and routine work tasks, such as the "simple and less than complex tasks" which have been assigned to plaintiff.

In this case, it is clear that plaintiff's mental limitations are not of the sort limited to counting cows that come off trucks, i.e., the job requirement of *less than* simple, repetitive abilities. Rather, plaintiff can act in simple situations with repetitive patterns. Thus, the parts assembler is within plaintiff's abilities, but the mail clerk job would be in excess of plaintiff's limitations. Because plaintiff can perform one of the jobs attributed to her by the vocational expert, there is no cause to find in plaintiff's favor.

*Conclusion*

Plaintiff's motion for summary judgment (Docket # 23) is denied; the Commissioner's cross-motion for summary judgment (Docket # 30) is granted. Judgment is to be entered for the Commissioner.

Dated: 10/28/10

/s/ Gregory G. Hollows
_____
UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
ingram.ss